Thank you, Your Honor. May it please the Court, I'm Ron Upsall for Appellant Jack McFarland. Mr. McFarland seeks to have the District Court opinion reversed. The District Court erred in not holding that McFarland held any common law easements to access his property and also failed in reversing and setting aside the administrative decision to deny him a permit. Since we're relatively short of time. Well, I had a question for you. You're looking like it would be helpful to you if we focused your comments. In this instance, your client has both an alternative route via the river crossing and alternative means of transportation by a non-motorized method. And since reasonableness of use is context specific and given the nature and location of this property, why isn't that legally sufficient to fulfill his rights, where really the issue isn't access so much as its motors? Well, the alternative route across the river doesn't provide him lawful access. There is no public access point to the river on the other side. He would have to cross lands of third parties. And it's pretty much black letter law that crossing the land of a third party does not defeat the necessity. What about the fact that he has other methods of accessing his property by land, other means, non-motorized means? Well, that would go to the scope of the easement, not the existence of the easement. This is where the district court erred. The test for necessity isn't whether you can walk or drive. It's whether you have to cross the lands of the grantor. It's geography. If you have to cross the lands of the grantor, that's the necessity under the common law. Walking access doesn't defeat necessity. Does that answer your permit question, though? The permit question, no, Your Honor. If the district court correctly held that he had the easement, the permit would have to be constructed in a way that would not impinge on that easement. No court has held that walking access is reasonable on your easement. Most courts don't get that far. They say if you have a gate, you have to provide a key. Counsel, is your argument consistent with what I'll call Fitzgerald II, Fitzgerald Living Trust v. United States, 460 F. 3rd, 1259? I thought in that case we said that necessity does not exist or another mode of access existed. Well, that case, the court held there and in Jenks that the statutory right of access defeated the necessity. Essentially, the courts both held that Congress abrogated the common law in passing ANILCA or FLTMA. So, yes, this argument is consistent with both Jenks and Fitzgerald. Both left open the question of whether easement by necessity applied. If there's no statutory use and in the absence of a statutory mode of access. Correct. In fact, Jenks said if the statutory easements were gone and if the public road easement that it found was gone, Jenks may have easement by necessity. So what was your answer to the question regarding the availability of a permit? Doesn't that obviate necessity? No, it does not. It doesn't obviate necessity. Why not? Well, he didn't get a permit. Why? I know, but the – I know, but that's because he thought it was – well, if there's a permitting process, why isn't that the equivalent of a statute? The permitting process. It's pursuant to regulation. It's pursuant to regulation, not through Congress's abrogation of common law. But even the district of Montana in Votendahl said – or it wasn't Votendahl. It was another case. I'm sorry. It slips my mind. The requirement of going through the permitting process doesn't defeat necessity. It wouldn't hinge the easement on the permit, on the availability of a permit. Right. But didn't we say in Hale v. Norton that even if there is an easement by necessity, it's subject to regulation by the Park Service? Didn't we say that? But, again, Hale is in the Milka case. It's a statutory right that provided the Park Service the authority to impose the permit requirement. So you're saying if there is no statute, there is no authority to have permit requirements? Is that your argument? Well, there's no statutory guarantee of access, so the permit can't impinge on the common law right of access. Now, what case says that? I don't know that there is a case that says that. I think we're making new law here. I just want to be sure I understand the facts correctly. Your client still has the opportunity to go in in other ways, even in the winter, a snowshoe, sled, cross-country ski, that sort of thing. Is that true? Right. He can walk in. Okay. The interviewer says dog sled, but dogs aren't allowed on the trails in the winter, so that's not an option, but he can walk in. Three miles, three children, groceries on a sled. But his rights shouldn't be any greater or lesser whether he has children or he doesn't. If you had a single person, wouldn't the law be the same? The law should be the same, yes. Okay. So the fact that he has children that he would like to bring with him and maybe they're not old enough to cross-country ski yet doesn't really have a legal effect on the analysis, does it? It shouldn't have a legal effect on whether he has an easement, no. Okay. It would have some effect on whether the requirement under a permit to walk and not drive. There's a reason. It would have an effect on, once the easement was determined, whether the impingement on that easement by the park service was reasonable, but not whether there was an easement or not. Counsel, are you familiar with the Mackey case? Yes. And how does this case differ from that? Well, Mackey is distinguishable in that the route that Mr. Mackey proposed didn't even take him to his property. It took him to a different access point where he would then boat, portage the canoe, boat again to get to his property. But it did say that that gave him access, even though he had to drive to the lake, then carry his supplies on his back, and then put everything into a boat and cross to his property. And so the court in that case said even no matter how inconvenient, if there's an alternate route, there's no easement by necessity. Why doesn't that principle guide us in this case? Well, the route that Mackey proposed didn't get to his property, so it's hard to say that you have an easement to your property that doesn't go to your property. Well, that was talking about the alternative. You're distinguishing? I'm distinguishing the routes. Yes. Yes, Your Honor. Now, McFarland's easement would take him right to his driveway. Well, that makes it even more, it seems to me, that that makes it even less in your client's favor than Mackey's situation because the existing method is easier on him than was the method for the litigant in Mackey. In Mackey? His method was the same regardless. He still had to hike several miles, boat across a couple of lakes under either of his proposals, under what the court gave him or what he suggested as his alternative. That it didn't get to his property would be like saying I have an easement to get to my property that goes to the gate and then I have nothing between the gate and the three miles that I have to take to get to my property. The easement, an easement by necessity needs to take you to your property. It can't take you to some other point and then set you adrift without getting you where you needed to go. So I think that's what defeats the easement in Mackey. The means of access were the same regardless of his route. So at best it's a reasonable necessity argument in that he was asking for a separate route different than he had. In McFarland, it's strict necessity. He needs to get there. He strictly needs to cross lands of the grantor to get to his property. So anything else you'd like to tell us in your opening portion or would you like to save some rebuttal time? I'd like to touch on the implied easement briefly. The district court incorrectly held that the Fitzgerald panel tied its hands on implied easements, saying that there was no implied easement in the Homestead Act patent. I don't think that was right. At best, the Fitzgerald court said there was no implied easement in the Homestead Act itself. Under the facts that are presented here, I think an easement is implied. The road preexisted both the entry of McFarland's predecessor and the establishment of the national park. There's no question that that road provided Schoenberger, the original homesteader, access to his property. The road is the boundary of the property. So it should be implied that he had the easement. His use was open. It was continuous. It was expected by all that it would be continued. Therefore, it should be implied that the easement carried. Counsel, are you familiar with the case from the Tenth Circuit in Albrecht, the Albrecht case in the Tenth Circuit? No, Your Honor. Would you like to save your time? I would like to save the last three and a half minutes. Sure. Ms. Peterson. May it please the Court, my name is Elizabeth Ann Peterson. I'm here on behalf of the federal appellees. And with me at counsel table are Chip Vance and Jack DeHolske from the National Parks Conservation Association. Mr. Vance will be presenting five minutes of argument following my argument. The question of your time. Yes. We are splitting the 15 minutes for the appellees between the two. The question here, as I believe the Court has made clear, is whether Mr. McFarland owns a private easement that would prevent the National Parks Service from regulating a road that abuts his property and whether the Park Service's denial of his request for a special use permit to make motorized use of the road in the wintertime when motorized use is otherwise prohibited was reasonable. We believe that the district court correctly concluded that there is no private easement and that the Park Service was reasonable in denying the special use permit at issue here. Let me ask you a factual question regarding the easement by necessity issue. I asked opposing counsel about river access. And part of his answer was that there is no publicly available way to get to the other side of the river. It's true that the river is there, but there's no way to get to the river. Is that factually correct, or do you have a different understanding of the record? The record here does not support that conclusion. What this record supports is the conclusion that Mr. McFarland's usual route of access from the opposite side of the river does involve his use of a private parcel on the opposite side. The vast majority of the land opposite Mr. McFarland's property on the north folk of Flathead is Flathead National Forest land, and therefore, public access to the river is likely, although not proven on this record, there's no evidence that it would be impossible to use. So you're saying it's his burden in the procedural context of the case to prove impossibility of access from that direction by publicly accessible routes, and he has not done that? Absolutely, Your Honor. Are there maps? I love maps. I'm afraid I can't identify a particular page of the record. There are several maps. And as those maps will illustrate, the McFarland property abuts the north fork. Okay. I've got exhibit B through D with maps, but are there more than that? Did I miss some? There are actually more than one place, I believe, Your Honor. But what is clear from those maps is that the Flathead National Forest occupies almost all of the land on the west side of the river, and that there are smalling holdings along there, apparently one of which is the location where Mr. McFarland historically has parked his car before wading across the river or skiing across. But at common law, it certainly was required to prove first and foremost in order to establish an easement by necessity that one's land was landlocked. And in this case, that evidence is completely lacking, since it's boarded on one side by a road and on the other by a river, either of which would have defeated an easement by necessity at common law. This Court has established a rule of necessity that requires an easement across public lands in order to establish the required necessity, and for that reason, a statutory easement will defeat necessity. In this case, he has access, he has regulated use of a park service road at all times of the year, and the only limit he has on access to his property is reasonable regulation by the park service for purposes of conservation of park resources. So is I correct in my characterization that this is an argument about motorization and not really about access? Absolutely. The only question here is whether he owns some private property interest that prohibits the National Park Service from enforcing its ban on motorized use of its road during the winter, and there's no foundation in this record for finding such a private interest. Then the remaining question is whether it was reasonable for the park service to deny the particular special use permit request that Mr. McFarland submitted, and clearly that was reasonable. The request was to make essentially unlimited use of motorized access over the course of the winter by snowmobile whenever the road was snowbound and by vehicle during the rest of the year. And those interests, while we recognize that they would certainly be helpful to Mr. McFarland if they could be accommodated, are in direct conflict with the preservation of any number of threatened and endangered species with non-motorized recreational uses of the same area, and the two interests have to be balanced in where they are in conflict. The precedence, the priority needs to be given by the park service under the Parks Act to preservation of the park resources. And in this case, it's clearly reasonable for the park to enforce its ban generally on the use of motorized vehicles. For that reason, I believe that this Court should affirm the lower court's affirmance of the agency's denial of the permit. Thank you. Thank you. Mr. Vance. Thank you, Your Honor. As a preliminary matter, I think Could you introduce yourself for the record? Sure. Sorry. My name is Chip Vance. I'm here today on behalf of the Defendant Intervenor Appellee of the National Parks Conservation Association. I believe the clearest map that we have in the record, or at least in the excerpts of record, is at the excerpts of record, page 5. And that shows the Flathead River with the forest preserve on the other side. The key is not entirely clear, but it does kind of demonstrate the breadth of the land that we're talking about here. The town of Holbridge has been described as kind of an island of settlement in a sea of forest reserve land. The Flathead River extends for quite a while through forest reserve land, so I think that consulting pretty much any map will demonstrate that there are any number of points of public access that the plaintiff could have. As I said, I'm here today representing the National Parks Conservation Association. Founded in 1919, the National Parks Conservation Association is America's only private, non-profit advocacy organization dedicated solely to protecting and preserving the national park system. Over the last century, NPCA has grown to represent over 330,000 members through its Washington, D.C. headquarters and 22 regional field offices, all working to further the NPCA's mission of protecting and enhancing America's national park system for present and future generations. As part of this mission, NPCA has great interest in ensuring that park lands are safeguarded against developments that have the potential to compromise the natural, cultural, and historic integrity of these special places. This concern stems from a core belief that our national parks are windows to our nation's past, home to some of our rarest plants and animal species, and places where every American can go to find inspiration, peace, and open space. Of NPCA's regional offices, the Glacier Field Office in Whitefish, Montana was NPCA's first-ever field office focused exclusively on a single national park. This office is particularly engaged in advocating for conservation of the wild character and world-class transboundary wildlife populations of the North Fork Valley. Many of NPCA's members live near the park and are able to enjoy it on a regular basis, and even more travel to the park from elsewhere to experience its unique qualities. Indeed, the many unique qualities of Glacier National Park help define it as not only one of the crown jewels of the national park system, but as one of the world's most significant natural resources. In this regard, in recognition of the park's many unique environmental qualities, the United Nations Educational, Scientific, and Cultural Organization has designated the park a World Biosphere Reserve. Wide variations in elevation, climate, and vegetation types on both sides of the continental divide encourage substantial biological diversity and offer sanctuary to numerous endangered, threatened, and rare North American animal species. In fact, the area in which the plant's property is located, commonly referred to as North Fork Region or Big Prairie, possesses qualities unique even within Glacier National Park. It's one of the few prairie-savannah habitats west of the continental divide and is a critical corridor for the movement of wildlife, including threatened grizzly bears. Big Prairie also provides a winter range and year-round habitat for deer and elk, is home to the threatened bald eagle, and is a critical portion of the habitat of Glacier's endangered gray wolf populations. Because resources are largely undisturbed, wildlife is abundant, and scenic values are outstanding, the Park Service has concluded that the North Fork area in particular offers unique visitor opportunities in contrast to the more developed and heavily used areas of the park. It was for these reasons, among others, the Park Service emphasized in the 1999 Final General Management Plan that with regard to the North Fork area specifically, resources should be managed to preserve the wild character of the area and an important linkage to the entire North Fork Valley for wildlife conservation specifically. To touch on some of the issues that Ms. Peterson was addressing, I believe the Fitzgerald 2 case goes a long way to answering all of the easement questions at issue here. I think it specifically addresses the plaintiff's arguments on both the express and the implied easement. I think it almost conclusively answers the question of easement by necessity. I think there might be one final small step that this Court needs to take. The Fitzgerald 2, first of all, the plaintiff acknowledges that federal law should apply here. He claims that state law can be resorted to fill some sort of gap in the federal common law. I think Fitzgerald pretty clearly demonstrates that there is no gap in the federal common law that needs to be filled here by resort to state law. Fitzgerald, as I said, conclusively determined the issues of the express and the implied easements and it provided the test under federal common law for an easement by necessity, the three-prong test, the most important of which is the final one, that at the time of severance the easement was necessary for the owner of the severed parcel to use his property. And I think it's pretty clear that at the time of severance in 1916, no property right known as an easement was necessary for the plaintiff's predecessor in interest to actually use his property. Counsel, may I ask you a question? Sure. Opposing counsel in his brief argued that in contrast to Fitzgerald 2, he's claiming an easement by prior use rather than implied in the language of the act. Fitzgerald 2 does not directly address that point. What's your response to that contention? My response to that contention would be that I don't believe that that's an issue that he raised in the district court. I don't specifically recall in his brief where he discusses that. Well, assuming it's raised, would you answer it on the merits? I think an easement by prior use would I mean, I think that he would not have an easement by prior use simply because I think that, I mean, he never required an easement to breach his property. I mean, I think that I'm not entirely familiar with the test for an easement by prior use, but I think that it would likely entail that the easement was, I mean, if it's not set forth expressly in some sort of deed or land patent, it was somehow necessary for the property owner to use his land or to at least reach his land. And I think it's pretty clear here that, you know, under the language of Fitzgerald 2, that, I mean, the Homestead Act clearly envisioned or anticipated some form of an access right by the private landowners. And I think that, you know, as Jenks 2 Court specified, it likely took the form of an implied license, which would have provided him access to his property. I mean, it might not have taken the form of a vested property right, but it certainly provided him, you know, a form of statutory access that would be sufficient to defeat any claim to necessity. I hope that answers your question. Judge Rolison, did that answer your question? Unless the Court has any other questions, I'll see the rest of my time back to the government. I think they rested, so, you know, half of the case is complete. And Mr. Upsall has some remaining rebuttal time. Thank you, Your Honor. First, the test for the implied easement. In Superior Oil, the Ninth Circuit then adopted the restatement view on implied easements. That would be that the prior use was not temporary, continued use was reasonably necessary, and the use was known to all the parties. Those elements are all met here. As to the implied license argument, Jenks 2 relied on Beaufort v. House for that, which arose under a very different factual scenario. That was basically a range war between cattlemen and sheepmen debating over who had the exclusive use of public lands to graze their animals. It wasn't a right necessary for the use of the homestead patent itself. It was grazing. It wasn't access. Access is fundamental to ownership. Briefly on permissive use, permissive use isn't sufficient to defeat a necessity. We cite that in a reply brief beginning at page 11. How on real property in several state court cases that all held permissive use isn't sufficient to defeat a necessity. At the district court below, Judge Molloy found that the defendants didn't dispute that crossing the river required McFarland to cross the lands of the third parties. Do we have de novo review? You do. And he doesn't really say that they – I actually underlined that sentence when I was reading it. He doesn't actually say they conceded it, but just that they didn't dispute it. And I'm not sure whether that means we're stuck or we're not stuck on de novo review. What's your thought on that? My thought would be that you're stuck. The best map that I know of isn't in the excerpts of record. It's plans for Exhibit 25 in the full record. It's a USGS map. It was submitted with, I believe, our statement of material facts. And what does your Exhibit 25 show with regard to what ownership the land has across the river? I believe it shows private ownership across the river. I'd have to look at it again to verify that, but I'm fairly sure that's what it says. But regardless, access by navigable waters does not defeat necessity. The common view, according to the ALR, 9 ALR 3rd 600, is that river access doesn't defeat strict necessity. No case since the 1920s has found river access to defeat strict necessity. And the district court also found that. I believe that is all I have. Thank you very much. The case just argued is submitted. We thank all counsel for their arguments, and we will stand adjourned for this session.
judges: Alarcon, Graber, Rawlinson